UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK

_____

ERASMO MOLINA,

                              Plaintiff                    DECISION AND ORDER

-vs-
                                                          13-CV-6532 CJS

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                              Defendant.
_____

APPEARANCES

For the Plaintiff:              Catherine M. Callery, Esq.
                                Empire Justice Center
                                One West Main Street, Suite 200
                                Rochester, New York 14614

For the Defendant:              Joanne Jackson, Esq.
                                Social Security Administration
                                Office of General Counsel
                                26 Federal Plaza, Room 3904
                                New York, New York 10278

                                Michael S. Cerrone, Esq.
                                Assistant United States Attorney
                                Federal Center
                                138 Delaware Avenue
                                Buffalo, New York 14202

INTRODUCTION

    This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Erasmo Molina ("Plaintiff") for Social Security

Supplemental Security Income ("SSI") disability benefits.  Now before the Court is

Plaintiff's motion (Docket No. [#9]) for judgment on the pleadings, seeking a remand to

1

the Commissioner, and Defendant's cross-motion [#13] for judgment on the pleadings.
Plaintiff's application is granted and Defendant's cross-motion is denied.

PROCEDURAL HISTORY

The Commissioner's records indicate that Plaintiff was previously granted
disability benefits, that were terminated when he became incarcerated. (162).  Plaintiff
reportedly was found to be disabled due to "mental retardation." *Id*.  According to
Plaintiff's representative, he "was previously on SSI benefits from 1999 through 2007 but
was discontinued after he was sent to prison." (225)  On July 26, 2010, Plaintiff re-
applied for benefits while he was still incarcerated. (161).  Apparently, when Plaintiff re-
applied, the persons evaluating his application did not request his prior claim folder. *Id*.
Consequently, the case file concerning Plaintiff's prior claim is not part of the record
before this Court.  Defendant maintains that the prior claim file was destroyed, pursuant
to a document retention policy that required files to be kept for only seven years after the
application was filed.  However, Plaintiff maintains that the Commissioner's actual
retention policy is to keep the files for ten years after the last payment on the file was
made.

As previously mentioned, on July 26, 2010, Plaintiff re-applied for SSI disability
benefits, claiming to be disabled due to the following conditions: "Blind in right eye,
Diabetes, drug & alcohol abuse" and "headaches." (166; *see also*,130-131).  Plaintiff
later expanded his claim to include "an intellectual disability, diabetes, blindness in one
eye, chronic back and knee pain, and a psychotic disorder, which in combination

interfere significantly with his ability to function."[1]  The Commissioner denied the application.

On February 7, 2012, Administrative Law Judge John P. Costello ("the ALJ") conducted a hearing, at which Plaintiff appeared and testified, accompanied by his non-attorney representative, Doris Cortez ("Cortez").  Cortez maintained that Plaintiff was disabled because he met the requirements of Listing 12.05(C). (37).[2]  Plaintiff testified with the assistance of an interpreter, although he indicated that he understood English "a little bit," (35), and one treating doctor described him as being fluent in English.[3]  On February 23, 2012, the ALJ issued a Decision (18-29), finding that Plaintiff was not disabled at any time between the date he filed for benefits and the date of the hearing.

On April 23, 2012, Plaintiff, through his representative, appealed to the Appeals Council.  At that time, Plaintiff argued that he met either listing 12.05B or 12.05C. (225-226).  Plaintiff claimed that he had previously been awarded benefits based on mental retardation and that his condition had not changed, which meant that he was still disabled. (225).  Plaintiff admitted that he had failed to attend multiple appointments for consultative examinations to determine his IQ, but claimed that was due to the fact that the notices for such examinations were not sent to his representative. (225)  Plaintiff further maintained that the ALJ misinterpreted certain information, erroneously evaluated his credibility and failed to develop the record. (225-226).  The Appeals Council declined

---

[1]Pl. Memo of Law, Docket No. [#9-1] at p. 1.

[2]Citations are to the Administrative Record unless otherwise indicated.

[3]See (316-317), medical notes of Brian Greenberg, D.O., who indicated that he obtained the medical history directly from Plaintiff, and that Plaintiff "speaks fluent English."

to review the ALJ's determination. (1-4).

On September 26, 2013, Plaintiff commenced this action.  As will be discussed further below, Plaintiff maintains that the ALJ's decision was erroneous in several respects.  First, Plaintiff maintains that the ALJ erred at step three of the sequential analysis, by finding that Plaintiff's intellectual disability does not meet the requirements for a listed impairment, and specifically, Listings 12.05(B) & (C).  In that regard, Plaintiff contends that the ALJ committed the following errors:  1) he failed to develop the record by obtaining Plaintiff's prior disability file; 2) he failed to obtain IQ testing; and 3) he failed to consider that in addition to having a low IQ, Plaintiff also has deficits in adaptive functioning.

Additionally, Plaintiff contends that the ALJ erred at the fifth step of the sequential analysis, by failing to include all of his mental limitations in a hypothetical question to the vocational expert ("VE") who testified at the hearing.  Specifically, Plaintiff maintains that the ALJ's hypothetical questions to the VE  failed to include limitations for his illiteracy and his purported inability to work with machinery.  Additionally, Plaintiff maintains that the ALJ erred by failing to insure that the VE's testimony, concerning the jobs that she said he could perform, was consistent with the requirements for those jobs as set forth in the Dictionary of Occupational Titles ("DOT").

VOCATIONAL HISTORY

The record contains conflicting evidence concerning Plaintiff's age.  Plaintiff indicated on papers that he submitted to the Commissioner that his birthdate is December 29, 1964.  However, the school records which Plaintiff submitted to the Commissioner indicate a birth date of February 12, 1965 (189-190), which perhaps

raises an issue as to whether they actually pertain to this claimant.  Moreover, at the hearing Plaintiff testified that he was 48, but he was actually only 47, assuming *arguendo* that the purported birth date of December 29, 1964 is correct. (39).

Plaintiff moved from Puerto Rico to Rochester when he was "around 14 years old." (39)  Plaintiff did not complete high school, and school records indicate that he was truant most of the time.  (190-191).  A Rochester City School District progress report summary covering the years 1978 through 1981 indicates that Plaintiff was administered the Spanish WISC-R intelligence exam, although the score is unclear, since it was recorded as "57?". (190)  At the hearing Plaintiff testified that he was "in some type of special program in school." (40)

Plaintiff apparently has never held a job.

## ACTIVITIES OF DAILY LIVING

The record provides little insight into Plaintiff's daily activities during the decades after he dropped out of school, except that he apparently abused drugs and alcohol consistently during most of that time.  In that regard, Plaintiff indicates that he used alcohol, cocaine and marijuana for approximately thirty years, but began substance abuse treatment in 2005. (Docket No. [#9-2] at p. 2).  Upon release from Prison Plaintiff began to use alcohol and drugs again, and he admits that his longest period of sobriety was while he was incarcerated. (54)

Plaintiff has suffered a number of injuries while under the influence of alcohol and/or drugs.[4]  For example, Plaintiff maintains that in 1990, he was beaten and robbed

---

[4]*See*, Pl. Memo of  Law,  Ex. 1 (Docket No. [#9-2]).

5

while under the influence of alcohol. (Docket No. [#9-2] at p. 1)  During that incident,

Plaintiff sustained facial fractures and injuries to his right eye that resulted in the eye

being surgically removed. Some time later, during the "late '90s or early '00s," Plaintiff

was intoxicated and riding a bicycle when he was struck by a car.  It is unclear whether

Plaintiff suffered any injuries during that incident because he refused medical treatment.

*Id*.  On May 12, 2002, Plaintiff was treated and released at the hospital after he was

assaulted while intoxicated. *Id*. at p. 2.  During that incident Plaintiff sustained facial

lacerations. *Id*.  Finally, on June 9, 2005, Plaintiff was again struck by a car, apparently

while intoxicated. *Id*.

It appears that in 1990 and 1992 Plaintiff applied for SSI Disability benefits and

was denied. (144).  Plaintiff contends that subsequently, in or about 1999, he was found

disabled and awarded SSI benefits on the basis of mental retardation.  However, the

record is far from clear on that point. *See*, Pl. Memo of Law [#9-1] at p. 3 ("SSA printouts

indicate that he *may* have been awarded benefits following an ALJ hearing in 1992.

Records also indicate that his benefits were continued after a Continuing Disability

Review in 1999.") (emphasis added, citations omitted).  For purposes of the instant

action, though, Defendant does not dispute that Plaintiff was previously awarded SSI

benefits based on mental retardation.

Plaintiff indicates that in or about 2009, he was convicted of a felony after he

robbed someone of a bicycle.[5]  Plaintiff served several years in prison, during which, he

_____

[5]Plaintiff testified that he was convicted of "Armed Robbery in the Second Degree." (39)  However, the website of the New York State Department of Corrections and Community Supervision indicates that Plaintiff was convicted of Attempted Robbery in the First Degree, and received a sentence of three years and six months.

maintains, his SSI benefits were discontinued due to the fact that he was incarcerated.

After being released from prison Plaintiff began living in a type of halfway-house or group home for persons with substance abuse problems as a condition of his parole. (39, 42)  That facility provides Plaintiff with transportation and meals. (41)[6]  However, Plaintiff is responsible for performing chores around the house, such as "light cleaning" including mopping and washing dishes, and doing his own laundry. (42-43)  Plaintiff indicated, though, that he sometimes gets "chastised" because he doesn't perform his chores. (42)  Plaintiff prepares his own meals three times per day, because he is diabetic. (194)  Plaintiff also attends alcoholic support meetings every day. (43)  Out of the public assistance that Plaintiff receives, the facility gives him a monetary stipend which he manages. (44)

Plaintiff indicates that a typical day for him involves getting up, taking his medications, attending a house meeting, going to his alcohol support meeting and watching television. (50, 192, 196)  Plaintiff has a large family and enjoys visiting them, as well as attending events such as church services, baseball games and wrestling matches. (196)   Plaintiff also likes to swim, listen to music, watch movies and help other people. (51, 196).

Plaintiff maintains that he is extremely limited in his ability to perform many activities. (197-204).  He states that he "can't lift that much," "cannot walk long distances," "cannot sit in chairs for any length of time," cannot kneel or squat, cannot see well out of his good eye, cannot walk more than half a block, cannot follow oral or written

---

[6]Plaintiff testified that he is presently unable to take public transportation because he "doesn't know how to read the . . . bus label sign or whatever" (41), but that seems to contradict his testimony suggesting that he is not free to leave the group home on his own in any event. (42)

instructions, cannot swim or ride a bicycle, cannot sleep, has pain in his chest, head,

knees and back, and has headaches "at least" twenty times per day. *Id*.   With regard to

the headaches, Plaintiff contends that they limit him to performing "no activities at all."

(204)

MEDICAL EVIDENCE

As noted earlier, Plaintiff suffers from a number of conditions including

hypertension, diabetes, blindness in one eye, intellectual disability and pain in his back,

knees and ankle. Plaintiff's medical history was accurately summarized in the parties'

submissions and need not be repeated here in its entirety.    The Court will summarize

the pertinent records below.

Despite Plaintiff's subjective claims about his physical health, the medical record

indicates that his physical ailments are relatively benign and that he rarely sought

treatment.  In that regard, Plaintiff's hypertension and diabetes are well-controlled with

medication and diet, and his joint pain is generally controlled with over-the-counter pain

relievers such as Tylenol,[7] though his doctor also prescribed the nonsteroidal anti-

inflammatory drug Etodolac for knee pain. (287)

In 2004, Plaintiff received in-patient treatment for cocaine and alcohol

dependence and cannabis abuse. (227-232)  However, Plaintiff rejected his provider's

recommendations regarding treatment, and was discharged from the program. (231)

That same caregiver reported that Plaintiff "did not behave interested in tx (treatment),

but [was] interested in his SSI." (231)  At that time Plaintiff denied feeling depressed. *Id*.

_____

[7]*See, e.g.*, (201) (Plaintiff indicated that he takes "Tylenol 500 mg" and "Ibuprofen 800 mg" for pain.).

On August 10, 2010, a prison doctor indicated that Plaintiff was capable of living alone and managing his medications. (233, 235).

On August 30, 2010, Thomas McElligot, M.D. ("McElligot") reviewed various laboratory tests and reported that Plaintiff's diabetes was "under good control" and that his cholesterol was "mildly elevated." (241).

On September 16, 2010, Harbinder Toor, M.D. ("Toor") conducted a consultative medical examination. (246-250).  Based on his examination, Toor found that Plaintiff had no neurological deficits, but had full strength in his hands and upper and lower extremities, intact hand and finger dexterity, and full range of movement in shoulders, elbows, forearms, wrists, hips and ankles. (248-249)  Plaintiff also had less than full range of movement in his lumbar spine, positive straight-leg-raising test and "slight tenderness and pain" in his left knee. (248).  Toor reported that Plaintiff would have "moderate difficulty" standing, walking, squatting, sitting for prolonged periods and performing heavy lifting, due to pain. (249)

On January 3, 2011, Plaintiff met with his new  treating physician Genevieve Johnson Stuber, D.O. ("Johnson Stuber"), and told her the following, in pertinent part: 1) he slept well; 2) he had only occasional "mild" headaches; 3) his mood was stable; and 4) he had chronic pain in his back and knees. (296)  Notably, with regard to the foregoing, Plaintiff denied having any "severe or recurrent headaches." (296)  Johnson Stuber conducted a physical examination and found that Plaintiff had "normal gait," "normal range of motion, stability, and muscle tone in neck, back, [and] extremities x 4." (297)  Johnson Stuber nevertheless prescribed Etodolac for pain and recommended that Plaintiff have physical therapy. (297)

9

On September 30, 2011, Plaintiff told Johnson Stuber that he experienced "occasional insomnia" and "occasional headaches." (290)

On October 3, 2011, Plaintiff was seen at the hospital after his halfway house denied him entrance because he had been drinking. (316)  The treating physician noted the following: 1) Plaintiff had ingested alcohol, but was not intoxicated; 2)  Plaintiff spoke fluent English and provided his own history;[8] 3) Plaintiff did not appear depressed; 4) Plaintiff had full range of movement in all extremities and no sign of weakness; and 5) Plaintiff was calm, lucid and able to follow directions. (316-317).

On February 6, 2012, Johnson Stuber completed a report regarding Plaintiff's ability to perform work-related activities. (322-325).  In pertinent part, Johnson Stuber reported that Plaintiff: 1) can occasionally lift 50 pounds and frequently lift 20 pounds; 2) can stand and/or walk for two hours per workday, and has an unlimited ability to sit; 3) should not perform "heavy pushing or pulling"; 4) should only occasionally climb, balance, kneel, crouch, crawl or stoop; 5) has an unlimited ability to reach, handle, finger and feel objects; and 6)"has mild mental retardation and is unable to safely manipulate any hazardous equipment." (325)

As for Plaintiff's mental abilities, apart from Johnson Stuber's references to "mild mental retardation" and "limited intellectual ability" (328), the record contains little evidence.  As already mentioned, there are some school records referencing intelligence and achievement testing that was performed in February 1978, ostensibly when Plaintiff was thirteen years of age. (190-191).  However, the WISC-R score of "57?" is cryptic and is not accompanied by any explanatory report. *Id*.

---

[8] *See* (316) ("Source of history: Patient  . . . The patient speaks fluent English.").

On September 16, 2010, Kavitha Finnity, Ph.D. ("Finnity") conducted a consultative psychiatric evaluation. (252-255).  Plaintiff reportedly told Finnity that he had completed the seventh grade and had attended "regular education classes." (252) Plaintiff indicated that he suffered from depression and anxiety, and also claimed to have problems with memory and concentration. *Id*.  Finnity conducted a mental status examination that revealed the following about Plaintiff: 1) his thought process was coherent and goal-directed; 2) his affect was depressed; 3) his attention, concentration and memory skills were impaired; 4) his insight and judgment were fair and his general fund of information was limited; and 5) his cognitive functioning appeared to be "borderline to mild mental retardation." (253)  Finnity observed, though, that Plaintiff was able to care for himself, that he could cook, clean and do his own laundry, and that he had a good relationship with his family. (253-254)  Finnity concluded that Plaintiff

> can follow and understand simple directions and perform simple tasks.  He has some difficulty with attention and concentration.  He can maintain a regular schedule.  He may have difficulty learning new tasks and performing complex tasks.  He can make appropriate decisions.  He has difficulty relating with others, and dealing with stress.

(254)

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).

THE ALJ'S DECISION

On February 23, 2012, the ALJ issued the decision that is the subject of this action. (18-29).  At the first step of the five-step sequential analysis described above, the ALJ found that Plaintiff had "not engaged in substantial gainful activity since July 26, 2010, the application date." (20)  At the second step of the analysis, the ALJ found that Plaintiff had the following severe impairments: "borderline intellectual functioning and diabetes mellitus." (20)  The ALJ found that Plaintiff's headaches, hypertension, back and knee pain, alleged psychotic disorder, polysubstance abuse and right-eye blindness were not severe impairments.  At step three of the five-step analysis, the ALJ found that

Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (21-23)  In pertinent part, the ALJ found that Plaintiff did not meet the requirements for Listing 12.05(B) or (C) because there was no valid IQ score, and because Plaintiff had repeatedly failed to appear for consultative IQ testing. (22)

Prior to reaching step four of the analysis, the ALJ determined that Plaintiff had the following RFC:

> [C]laimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c).  He can perform no more than simple repetitive tasks.  The claimant cannot interact with the general public.  He can occasionally interact with coworkers.

(23).  In making that determination, the ALJ indicated that he found Plaintiff's statements not credible. (25)  For example, the ALJ found that Plaintiff exaggerated the extent of his symptoms related to headaches and his alleged inability to use public transportation or engage in other activities. (26)

At step four of the five-step analysis, the ALJ found that Plaintiff had no past relevant work. (28)  However, at step five of the analysis, the ALJ found, based on testimony from a vocational expert, that with the RFC set forth above Plaintiff could still perform other jobs in the national economy. (28-29)  Specifically, the ALJ found that Plaintiff could perform at least two medium jobs: laundry laborer, DOT 361.687-018, and industrial cleaner, DOT 381.687-018.

DISCUSSION

Whether Plaintiff Meets Listing 12.05(B) or (C)

Plaintiff contends that he has a listed impairment under either 12.05(B) or 12.05(C) and that the ALJ erred at Step 3 of the sequential evaluation in several

13

respects.  Plaintiff maintains that he was previously determined to be eligible for SSI

benefits based on mental retardation, and that such benefits were stopped because he

was sent to prison, not because he stopped being disabled.  Consequently, Plaintiff

contends that the ALJ should have developed the record by obtaining and considering

his prior claim file.

Plaintiff further contends that the ALJ failed to develop the record by obtaining

new IQ testing.  In that regard, although Plaintiff failed to appear for such testing, he

maintains that it was the Commissioner's fault, because notices concerning the testing

were not sent to his representative's office.  As to this point, it is undisputed that well

before the hearing, Plaintiff's representative filed a notice of appearance and requested

that Plaintiff be given further IQ testing. (220).[9]  The Commissioner apparently sent at

least two notices regarding additional consultative testing to Plaintiff.  However,

Defendant never provided Plaintiff's representative with notice of the consultative

exams.[10]

On such facts, the Court agrees that the matter should be remanded for further

development of the record.  In the first place, the Commissioner should make a further

effort to locate the prior claim file, since that obviously could shed light on Plaintiff's

condition, even if the earlier favorable determination has no *res-judicata*-type effect on

---

[9]Such request was consistent with the recommendation of the Comissioner's own review physician, who indicated that it was necessary to obtain IQ testing. (277) ("To fully evaluate the claimant's functioning IQ testing is required.").

[10]At oral argument, the Court placed Plaintiff's representative, Ms. Cortes, under oath, and she indicated that she never received any notice from Commissioner regarding the consultative examinations that Plaintiff failed to attend.

the Commissioner's present ability to determine Plaintiff's eligibility for benefits.[11]   In that regard, it appears that Plaintiff's counsel is correct that the Commissioner's own policies require that paper files be kept for a period of ten years after the last payment is made, in which case the Commissioner should still have the file. *See*, Hallex I-2-1-10(D) ("As a general rule, paper claim(s) files in which the claim was favorably decided are retained for approximately 5 years (non-disability) or 10 years (disability) after the last payment is made.").  If the Commissioner is unable to locate the file, she should provide an explanation, in the event there is further judicial review.

Additionally, the Commissioner should develop the record by obtaining IQ testing. The Commissioner's review physician recognized the need for such testing, but the ALJ apparently determined that he could dispense with it after Plaintiff failed to appear for testing on multiple occasions.  The problem, though, is that there are questions as to whether Plaintiff, who is illiterate and allegedly mentally retarded, actually received or understood the notices pertaining to such testing, and, more importantly, Plaintiff's representative never received the notices, which prevented her from facilitating Plaintiff's attendance.  Furthermore, the ALJ did not question Plaintiff about the circumstances surrounding his failure to appear for testing.[12]   Consequently, on remand the

---

[11]*See*, Hallex I-2-1-13 ("An ALJ will generally find that evidence in a prior claim(s) file is necessary for a full adjudication of the issues when the ALJ determines: There is a need to establish a longitudinal medical, educational, or vocational history; or The impairment is of a nature that evidence from a prior folder could make a difference in establishing whether disability is present in the current claim.")

[12]Plaintiff further maintains that the ALJ erred in his evaluation under Listing 12.05 because he failed to consider whether, apart from the IQ requirements, Plaintiff had the required deficits in adaptive functioning. *See, e.g., Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012) (Indicating, *inter alia*, that deficits in adaptive functioning must manifest themselves before age 22 and must arise solely from cognitive limitations, as opposed to physical ailments.)  The ALJ's decision does not contain any discussion of adaptive functioning *per se*, although at oral argument Defendant's counsel contended that the ALJ had essentially discussed adaptive functioning when he discussed Plaintiff's activities of daily living.  However, it is unclear to the Court whether the ALJ in fact considered adaptive functioning.

Commissioner should obtain IQ testing, to the extent possible.[13]

> Whether the ALJ's RFC determination is supported by substantial
> evidence or affected by error of law

Plaintiff maintains that the ALJ's questions to the VE were not based on substantial evidence because they failed to include limitations based on Plaintiff's illiteracy and inability to safely operate machinery.  Since those limitations were not included in the RFC, the Court understands Plaintiff to be arguing that the RFC determination is incorrect.  With regard to Plaintiff's illiteracy, it is undisputed that he is in fact illiterate in both English and Spanish.  However, to the extent that the ALJ did not expressly include illiteracy in either the RFC or his hypotheticals to the VE, it appears that any such error was harmless for a couple of reasons.  First, the VE indicated that she had reviewed the file exhibits, and the ALJ specifically asked her, as part of his hypothetical questioning, to consider a hypothetical claimant who had the same education as Plaintiff. (54-55).  Moreover, during cross examination of the VE, Plaintiff's representative reiterated that her client could not read, and asked whether such fact would change the VE's opinion that Plaintiff could perform the job of housekeeper/cleaner, which required the ability to read labels. (57) The VE responded that a person did not need to be able to read to perform that job, assuming that he was properly trained. (57-58)

---

[13]In support of his application, Plaintiff submitted a report, dated February 25, 2014, from neuro-psychologist Marc Gaudette, PsyD ("Gaudette"), who gave Plaintiff "select tests" of the Wechsler Adult Intelligence Scale-IV. (Docket No. [#9-2], Ex. A).  However, Gaudette indicated that due to certain factors peculiar to Plaintiff, there was "not an appropriate or exact normative data set to accurately judge his test scores," and that therefore his "standardized scores and percentiles [could not] be taken literally, or interpreted in the normal fashion." *Id*.

16

As for Plaintiff's purported inability to "operate machinery,"[14] he is referring to Johnson Stuber's opinion that he "is unable to safely manipulate any hazardous equipment." (325)  The ALJ acknowledged that Johnson Stuber expressed that opinion, and he further indicated that he was giving the opinion "great weight." (27)  However, the ALJ did not incorporate that limitation into his RFC finding. (23)  Plaintiff maintains that was error, but on the other hand he has not shown that any of the jobs which the VE identified involve the use of hazardous equipment.  In any event, upon remand, if the analysis proceeds past step 3 of the sequential analysis, the ALJ ought to include all of Plaintiff's limitations in his RFC determination. *See, e.g.*, 20 C.F.R. § 416.945(e) ("[W]e will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity.").

<u>Whether the ALJ's findings at Step 5 are supported by substantial evidence or affected by error of law</u>

Plaintiff maintains that the ALJ erred by finding that he could perform the two jobs identified earlier, because the ALJ did not insure that the VE's testimony concerning those jobs was consistent with the DOT.  Specifically, Plaintiff maintains that because of his mental limitations and illiteracy, he does not meet the educational requirements for those jobs as set forth in the DOT.  In that regard, the job of "laundry laborer," DOT 361.687-018, has general educational development ("GED") requirements, in reasoning, math and language development, respectively of R1, M1 and L1, which are defined as follows:

---

[14]*See*, Pl. Memo of Law at p. 25 (Indicating that Plaintiff "would have difficulty operating machinery due to his intellectual functioning.").

17

01 LEVEL REASONING DEVELOPMENT
Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

01 MATHEMATICAL DEVELOPMENT
Add and subtract two digit numbers.  Multiply and divide 10's and 100's by 2, 3, 4, 5.  Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

01 LANGUAGE DEVELOPMENT
Reading: Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute.  Compare similarities and differences between words and between series of numbers.  Writing: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.  Speaking: Speak simple sentences, using normal word order, and present and past tenses.

DOT, Appendix C, § III.  The job of "industrial cleaner," DOT 381.687-018, also has a

math requirement of M1, but has reasoning and language requirements requirements of

R2 and L2, respectively, which are defined as follows:

02 LEVEL REASONING DEVELOPMENT
Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

02 LANGUAGE DEVELOPMENT
Reading: Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes. Writing: Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs.  Speaking: Speak clearly and distinctly with appropriate pauses and emphasis, correct pronunciation, variations in word order, using present, perfect, and future

tenses.

DOT, Appendix C, § III.

In this case, even assuming that Plaintiff is capable of performing the reasoning requirements of these two jobs, it is unclear whether he could otherwise meet the jobs' GED requirements, or whether the VE was indicating that she believed Plaintiff could perform the jobs notwithstanding the DOT requirements.  Consequently, although the VE testified, in response to questioning by the ALJ at a different point in the hearing, that her testimony was consistent with the DOT (56), the apparent conflict is unexplained.  Upon remand, if the analysis proceeds to step 5 of the sequential analysis, the ALJ ought to explain any such apparent inconsistency.[15]

CONCLUSION

Plaintiff's application [#9] is granted, defendant's application [#13] is denied, and this matter is remanded to the Commissioner for further administrative proceedings, pursuant to 42 U.S.C. § 405(g), sentence four.

So Ordered.

Dated: Rochester, New York
         October 2, 2014

                                        ENTER:


                                        /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Judge

_____

[15]*See*, Social Security Ruling 00-4p ("[B]efore relying on VE . . . evidence to support a disability determination or decision, [ALJs] must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs . . . and information in the Dictionary of Occupational Titles (DOT) . . . and explain in the determination or decision how any conflict that has been identified was resolved.")